U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2020 DEC 22  PM 2: 59

CLERK

BY_____
DEPUTY CLERK

LEONARD K., JR.,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        Case No. 2:19-cv-00011
                                    )
COMMISSIONER OF SOCIAL SECURITY,    )
                                    )
            Defendant.              )

**OPINION AND ORDER**
**GRANTING PLAINTIFF'S MOTION FOR AN ORDER REVERSING THE**
**DECISION OF THE COMMISSIONER, DENYING THE COMMISSIONER'S**
**MOTION FOR AN ORDER AFFIRMING THE DECISION, AND REMANDING**
**FOR FURTHER PROCEEDINGS**
(Docs. 9 & 14)

Plaintiff Leonard Kelley, Jr., is a claimant for Social Security Disability Insurance

Benefits ("DIB") under the Social Security Act (the "SSA"). He brings this action

pursuant to 42 U.S.C. § 405(g) to reverse the decision of the Social Security

Commissioner (the "Commissioner") that he is not disabled. (Doc. 9.) The Commissioner

moves to affirm. (Doc. 14.)

Plaintiff is represented by Mary C. Welford, Esq. Special Assistant United States

Attorney Daniella M. Calenzo represents the Commissioner.

**I.     Procedural History.**

On November 27, 2012, Plaintiff filed an application for DIB, alleging a disability

onset date of February 5, 2011, due to a back injury related to lifting heavy truck tires.

His date last insured was June 30, 2016. The SSA denied his application on January 29,

2013, and on reconsideration on August 9, 2013.

Plaintiff filed a timely request for a hearing and on September 14, 2014, a

videoconference hearing was held before Administrative Law Judge Thomas Merrill (the

"ALJ") at which Plaintiff and Vocational Expert ("VE") Elizabeth C. LaFlamme

testified. On November 24, 2014, the ALJ issued a written decision finding that Plaintiff was not disabled. In that decision, the ALJ found that Plaintiff had a residual functional capacity ("RFC") to perform sedentary work and although he could not perform his past relevant work, there were jobs in significant numbers in the national economy that he could perform. Plaintiff filed a timely appeal to the SSA's Office of Disability Adjudication and Review Appeals Council (the "Appeals Council"), which denied his request for review on February 29, 2016.

On April 15, 2016, Plaintiff filed a Complaint in this court and filed a motion to reverse the Commissioner's decision. The Commissioner filed a motion to affirm. On April 25, 2017, Chief Judge Geoffrey W. Crawford of this court issued an Opinion and Order remanding the ALJ's determination that Plaintiff had no nerve root compression which this court found was not supported by substantial evidence and instructing the ALJ to make a "new determination at step three consistent with the [court's opinion]" (the "Remand Order"). (AR 597.) On appeal to the ALJ, the SSA consolidated a January 19, 2017 application for DIB filed by Plaintiff alleging a reading and writing disability, a learning disability, peripheral anatomic neuropathy, and back related impairments. Plaintiff timely requested a hearing and on September 19, 2018, an in-person hearing was held in which Plaintiff, VE Dennis King, and John Kwock, MD, testified.

On October 18, 2018, ALJ Merrill again issued an unfavorable decision concluding that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. The ALJ found that Plaintiff had the RFC to perform light work and although he cannot perform his past relevant work, there are jobs in significant numbers in the national economy that he can perform.

Plaintiff filed his Complaint on January 16, 2019 and a motion to reverse the decision of the Commissioner on June 27, 2019. On October 9, 2019, the Commissioner filed a motion to affirm. On appeal, Plaintiff asserts the ALJ erred by failing to follow the Remand Order; misapplied Step Two of the analysis; failed to follow the treating

2

physician rule; and misapplied the medical equivalence rule. He requests a remand for the calculation of benefits.

## II.     The ALJ's Application of the Five-Step, Sequential Framework.

In order to receive DIB benefits, a claimant must be disabled on or before his date last insured.[1] SSA regulations set forth the following five-step, sequential framework to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citations omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

In this case, the ALJ concluded at Step One that Plaintiff had not engaged in any substantial gainful activity since February 5, 2011, his alleged onset date. At Step Two,

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

he concluded that Plaintiff had the severe impairments of degenerative joint disease and degenerative disc disease of the lumbar spine. Based upon Plaintiff's Global Assessment Functioning ("GAF") score of eighty-five, Plaintiff's previous vocational rehabilitation services skills scores, his ability to function successfully in a job for twenty-seven years, and a review of the record by two consultative psychologists, the ALJ determined that Plaintiff did not have a severe mental health impairment.

At Step Three, the ALJ concluded that no impairment or combination of impairments met or medically equaled the severity of a listed impairment. The ALJ found that regardless of whether Plaintiff had nerve root compression, he consistently presented with a negative straight leg raise, normal strength, gait, and sensation, and that Plaintiff was "neurologically intact, except when presenting with non-dermatomal symptoms[.]" (AR 514.)[2]

At Step Four, the ALJ determined that Plaintiff had the RFC to:

[P]erform light work as defined in 20 CFR 404.1567(b) except that he can that lift and carry 20 pounds occasionally and 10 pounds frequently. He can stand and walk for 6 hours and sit for 6 hours. He can push and pull frequently to operate foot controls. He can frequently climb ramps and stairs, occasionally stoop and crawl and occasionally climb ladders, ropes and scaffolding and can frequently be exposed to hazards.

(AR 514-15.)

At Step Five, the ALJ determined that Plaintiff could not perform his past relevant work, but considering his age, education, work experience, and RFC, there were a significant number of jobs in the national economy that Plaintiff could perform. Relying on the VE's testimony that Plaintiff could perform positions as garment sorter, laundry

---

[2] The ALJ does not provide a definition of "neurologically intact" or "non-dermatomal symptoms" and these terms were not contained in the medical report he cites. Rather, that report notes: "Light touch sensation is definitely diminished on the left when compared to the right. This is diffuse in the entire leg and foot and doesn't seem to follow a dermatomal pattern." (AR 491.) "Dermatome" refers to sections of a person's skin which have been mapped "in order to show the nerve supply to each area." ATTORNEYS MEDICAL ADVISOR, § 3:52 (Christine Stewart and Betty Brutman, eds. 2020). "By studying the dermatomes, it is possible to locate the site of neural disorder or damage." *Id.* The report cited also does not state Plaintiff presented as "neurologically intact." (AR 491.)

4

worker, and small parts assembler, the ALJ found that Plaintiff was "capable of making successful adjustment to other work" (AR 522) and was not disabled.

## III. Conclusions of Law and Analysis.

### A. Standard of Review.

In reviewing the Commissioner's decision, the court "'conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal brackets and quotation marks omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision if it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g). The Commissioner, not the reviewing court, resolves evidentiary conflicts and determines credibility issues, and the court may not substitute its own judgment for that of the Commissioner. *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984).

### B. Whether the ALJ's Finding of No Nerve Root Compression Violated the Remand Order.

Plaintiff asserts that the ALJ did not follow the Remand Order but instead conducted his own analysis of the medical evidence to support his conclusion that there was no nerve root compression. In the alternative, if the Remand Order did not compel the ALJ to find nerve root compression, Plaintiff contends the ALJ failed to render a decision consistent with the Remand Order. The Commissioner counters that the Remand Order did not compel the ALJ to find nerve root compression without further analysis but

5

even if that interpretation of it is adopted, Plaintiff must still demonstrate Listing 1.04(A) is satisfied and has not done so.

The Remand Order was based on a finding by this court that "there is some evidence of nerve root compression in the record" and that "[t]he ALJ's contrary determination is not supported." (AR 596.) This court declined to address whether Plaintiff's condition satisfied the remaining requirements of Listing 1.04(A). Therefore, on remand the ALJ was free whether the other requirements of Listing 1.04(A) were satisfied. Relying on the same evidence from his November 24, 2014 decision, the ALJ concluded: "[t]here is no evidence of nerve root compression as of the claimant's alleged onset date[,]" (AR 512), and "[o]f note, Dr. Shen did not write that there was nerve root compression found during his 2013 minimally invasive surgery[.]" (AR 513.) However, in the alternative, the ALJ held that "regardless of nerve root compression or not, the [Plaintiff] consistently presented with negative straight leg raise finding. He had normal strength, normal sensation, and normal gait" and concluded "the [Plaintiff's] spine condition does not meet or medically equal the criteria of [L]isting 1.04." (AR 514.) That Listing states:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Courts have disagreed how to interpret Listing 1.04(A) with some courts concluding that nerve root compression is a separate requirement while other courts finding that "nerve root compression characterized by neuro-anatomic distribution of pain" is required by Listing 1.04(A). *Compare Radford v. Colvin*, 734 F.3d 288, 293 (4th Cir. 2013) (conducting a textual analysis and interpreting Listing 1.04(A) as requiring

6

evidence of nerve root compression "distinguished by – the four symptoms."); *Reynard v. Colvin*, 220 F. Supp. 3d 529, 536 (D. Vt. 2016) (treating nerve root compression as the predicate and the remaining elements as evidence of nerve root compression); *Jeske v. Saul*, 955 F.3d 583, 588 (7th Cir. 2020) (same); *Ryan v. Astrue*, 5 F. Supp. 3d 493, 508-09, 508 n.13 (S.D.N.Y. 2014) (same); *with Norman v. Astrue*, 912 F. Supp. 2d 33, 78-79 (S.D.N.Y. 2012) (treating "evidence of nerve root compression characterized by neuro-anatomic distribution of pain[,]" "limitation of motion of the spine[,]" and "motor loss . . . accompanied by sensory or reflex loss" as separate requirements); *Davis v. Astrue*, 2010 WL 2545961, at \*4 (N.D.N.Y. June 3, 2010) (same). Under either approach, nerve root compression is a requirement of Listing 1.04(A) that can be determined independent of whether there was a positive straight leg raise test, motor loss, and sensory or reflex loss.

The ALJ should have started his analysis acknowledging that, as the Remand Order held, there was some evidence of nerve root compression[3] and then analyzed the other requirements under Listing 1.04(A), including whether there were positive straight leg tests in both the sitting and supine positions. It was thus error for the ALJ to fail to follow the Remand Order in this respect.

## C.    Whether the ALJ's Finding that there was no Positive Straight Leg Test is Supported by Substantial Evidence.

Plaintiff contends the ALJ committed reversible error by concluding that there were no positive straight leg tests because Plaintiff had positive straight leg tests on three separate occasions, in April 2011 and July and August of 2012. He asserts that the ALJ's conclusion that Plaintiff presented "no requisite positive straight-leg raising tests[,]" (AR 512), was not harmless error because the ALJ acknowledged that "[u]nder Listing 1.04 . . . a positive straight leg raise finding is evidence of nerve root compression." *Id.* at 514.

---

[3] Evidence of nerve root compression includes: the magnetic resonance imaging ("MRI") conducted on July 29, 2009 which revealed compression at the right L5 nerve root; the March 3, 2011 MRI which showed "moderate right neural foraminal stenosis and encroachment on the right lateral recess" (AR 300); positive straight leg tests; and Jian Shen, MD's July 22, 2014 opinion in which he opined that Plaintiff's condition met Listing 1.04(A).

The ALJ also ignored evidence of other symptoms relevant to Listing 1.04(A).[4]

At Step Three, Plaintiff must demonstrate by a preponderance of the evidence that an impairment lasted or will last for at least twelve months. The ALJ found that from "April to August 2012, the [Plaintiff] presented with a normal gait, and with normal range of motion or all his major joints and muscle groups." *Id.* at 513. Citing Dr. Shen's note dated July 22, 2013, showing a negative straight leg raise test, *id.* at 490, and a July 22, 2014 report in which Dr. Shen states that Plaintiff was unable to complete a straight leg raise in either leg in a sitting or supine position, *id.* at 469, the ALJ concluded that the Plaintiff "consistently presented with negative straight leg raise finding." *Id.* at 514.

An ALJ is "required to explain why claimant failed to meet or equal the Listings '[w]here the claimant's symptoms as described by the medical evidence appear to match those described in the Listings.'" *Monsoori v. Comm'r of Soc. Sec.*, 2019 WL 2361486, *3 (W.D.N.Y. June 4, 2019) (quoting *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 273 (N.D.N.Y. 2009)). The ALJ must "build an accurate and logical bridge from the evidence to [his] conclusion to enable meaningful review." *Hamedallah ex rel. v. Astrue*, 876 F. Supp. 2d 133, 142 (N.D.N.Y. 2012) (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)) (internal quotation marks omitted). In this case, the ALJ disregarded evidence of three positive straight leg tests and other symptoms relevant to the applicable Listing.

Although a claimant must "present medical findings equal in severity to *all* the

---

[4] In finding that Plaintiff does not meet Listing 1.04(A) because he does not have the associated symptoms, ALJ Merrill disregarded evidence in the record that Plaintiff has: "pain in his lower back and shooting down his [right] leg" (AR 276); "lower extremity numbness and lower extremity tingling" *id.* at 278; pain "[n]oted in both legs" *id.* at 352; "[r]esidual neurogenic symptoms in the legs" *id.* at 493; "[d]iminished range of motion in all planes" *id.* at 501; "[d]ecreased ROM to trunk torsion L&R" *id.* at 1033; "[r]ange of motion is painful with left lateral flexion and right lateral flexion" (AR 335); "[h]e can never flex (bend forward) for more than a brief moment because that will always cause a flare-up" *id.* at 1074; "[i]n a standing position, motion in his lumbar spine is restricted" *id.* at 357; "[s]ensory evaluation shows . . . decreased sensation left thigh in a non-dermatomal pattern. On motor evaluation he has decreased strength in all areas tested in both legs anywhere for 5 minus to 4+ over 10." *Id.* at 314; "distal numbness, weakness in the limbs" *id.* at 352; positive straight leg raise test; "[s]traight leg raise, femoral tension stretch and Faber maneuvers all cause low back pain" *id.* at 314; "antalgic gait" (AR 314, 360); impaired gait that is "forward, flexed, antalgic, wide." *Id.* at 426.

criteria for the one most similar listed impairment[,]" *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990), at least one Circuit has held a claimant need not demonstrate that all symptoms are present simultaneously:

> Listing 1.04A requires a claimant to show only what it requires him to show: that each of the symptoms are present, and that the claimant has suffered or can be expected to suffer from nerve root compression continuously for at least 12 months. A claimant need not show that each symptom was present at precisely the same time—i.e., simultaneously—in order to establish the chronic nature of his condition. Nor need a claimant show that the symptoms were present in the claimant in particularly close proximity. As the Commissioner recognizes, abnormal physical findings may be intermittent, but a claimant may nonetheless prove a chronic condition by showing that he experienced the symptoms over a period of time as evidenced by a record of ongoing management and evaluation. To require proximity of findings would read a new requirement into the listing that is unsupported by the text, structure, medical practice, or common sense, and we decline to do so.

*Radford v. Colvin*, 734 F.3d 288, 294 (4th Cir. 2013) (internal citation and quotation marks omitted). Other courts[5] have followed the SSA Acquiescence Ruling ("AR") 15-1(4) which states, "when the listing criteria are scattered over time, wax and wane, or are present on one examination but absent on another, the individual's nerve root compression would not rise to the level of severity required by listing 1.04A" and "the claimant must also show that this level of severity continued, or is expected to continue, for a continuous period of at least 12 months." Consistent with the plain language of Listing 1.04(A), the court agrees with the Fourth Circuit that the simultaneous and continuous presence of all Listing requirements is not mandated if the twelve-month requirement is otherwise satisfied.

The Commissioner's argument that any error is harmless because the ALJ's decision accurately reflects Plaintiff's failure to satisfy the other requirements of Listing 1.04(A) is unavailing because the ALJ did not adequately address those requirements and

---

[5] *See, e.g., Casillas v. Comm'r of Soc. Sec.*, 2020 WL 4283896, at *4 n.2 (W.D.N.Y. July 27, 2020); *Wahler v. Comm'r Soc. Sec.*, 2020 WL 3496300 (W.D.N.Y. June 29, 2020); *Monsoori v. Comm'r of Soc. Sec.*, 2019 WL 2361486, *4 (W.D.N.Y. June 4, 2019).

the court cannot affirm the ALJ's decision on different grounds from those considered by the agency. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (a court reviewing the decision of an administrative agency "must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."); *Lesterhuis v. Colvin*, 805 F.3d 83, 89 (2d Cir. 2015) (per curiam) ("we may not affirm an administrative action on grounds different from those considered by the agency") (internal quotation marks omitted). On remand, the ALJ must follow the Remand Order, recognize the positive leg tests, and address all of the requirements of Listing 1.04(A).

For the foregoing reasons, the court GRANTS Plaintiff's motion to reverse and DENIES the Commissioner's motion to affirm.

### D.     Whether the ALJ's Finding that Plaintiff's Mental Impairments were not Medically Determinable or Severe is Supported by Substantial Evidence.

Plaintiff asserts that the ALJ's Step Two determination is not based on substantial evidence because he failed to consider Plaintiff's severe learning disabilities and rejected evidence of his inability to read and write. At Step Two, the ALJ must determine whether Plaintiff had a medically determinable impairment or impairments and whether those impairments meet or equal an impairment listed in Appendix 1. 20 C.F.R. § 416.920. To establish a medically determinable impairment, the SSA requires evidence from an acceptable medical source using "medically acceptable clinical and laboratory diagnostic techniques" and the "mental impairment must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521. The second part of Step Two requires the ALJ to determine whether the impairment is severe. *Id.* "[T]he standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases." *McIntyre*, 758 F.3d at 151; *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (agreeing with the Supreme Court and sister circuits that "Step Two may do no more than screen out *de*

*minimis* claims.") (citing *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987) (O'Connor, J., concurring)).

The ALJ relied on several sources to determine that Plaintiff did not establish a mental health impairment, including his findings that although Plaintiff received special education services he also participated in vocational rehabilitation services focused on math and computer skills and that he answered 19/25 questions correctly on a computational test. He cited evidence that Plaintiff "did graduate from high school"[6] and "was receptive to instruction and attentive" (AR 510) as supporting a conclusion that Plaintiff could read and write.

The ALJ further cited a June 2014 report by Philip Drum, PhD, a licensed clinical psychologist, for psychological clearance for a spinal cord stimulator in which Plaintiff is recorded as presenting with a euthymic mood, an appropriate affect, and expressing no gross cognitive abnormality. Dr. Drum opined that Plaintiff's GAF score was eighty-five which the ALJ noted was historically indicative of normal mental status even though the GAF was removed from the diagnostic and statistical manual of mental disorders in 2015.[7] Additionally, the ALJ found Plaintiff was able to work at Bennington Tire

---

[6] Pursuant to the SSA regulations "numerical grade level may not represent . . . actual educational abilities." 20 C.F.R. § 404.1564; *see also Skinner v. Sec'y of Health & Human Servs.*, 902 F.2d 447, 450 (6th Cir. 1990) (holding "[a] numerical grade level is properly used to determine a claimant's educational abilities only if contradictory evidence does not exist" and that evidence of illiteracy contradicted the ALJ's determination that the claimant had "marginal education"); *Matthews v. Comm'r of Soc. Sec.*, No. 1:13-CV-195, 2014 WL 5392991, at *10 (D. Vt. Oct. 23, 2014) (holding that an ALJ improperly relied on numerical grade level when there was other evidence in the record demonstrating the claimant's limited education, including the claimant's limited ability to read).

[7] GAF scores are of limited relevance to a SSA disability determination. *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-5 (2000) (stating a GAF score "does not have a direct correlation to the severity requirements in [the SSA's] mental disorders listings"); *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) ("[T]he Commissioner has declined to endorse the [GAF] score for use in the Social Security . . . disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings.") (internal quotation marks omitted); *Berry v. Comm'r of Soc. Sec.*, 2015 WL 4557374, at *3 n.10 (S.D.N.Y. July 29, 2015) ("the utility of [a GAF score] is debatable, particularly after its exclusion from the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders.").

11

Corporation from 1984 through February 6, 2011 without "problem in any functional area[,]" (AR 511), and Dr. King, Plaintiff's primary care provider, noted that Plaintiff's medical history did not include depression, anxiety disorder, or substance abuse. This, however, was not the only evidence in the record and, in any event, does not negate Plaintiff's claim that he is unable to read and write.

In a report ordered by the ALJ, in addition to his concerns regarding Plaintiff's "possible mild mental retardation[,]" (AR 421) Dr. Korgeski opined that it "[s]ounds as though he has pervasive academic difficulties so [cannot] diagnose clearly as LD vs. borderline IQ vs. MR . . . . He came across as having significant intellectual disabilities." *Id.* The ALJ discounted these observations because Dr. Korgeski did not offer a definitive diagnosis. This was error. *See* 20 C.F.R. § 416.920(a)(3) (requiring an ALJ to consider "all evidence in your case record when we make a determination or decision whether you are disabled."); *Lopez v. Sec'y of Dep't of Health & Human Servs.*, 728 F.2d 148, 150-51 (2d Cir. 1984) (holding that a decision should be remanded "when it appears that the ALJ has failed to consider relevant and probative evidence which is available to him."). If the ALJ found Dr. Korgeski's opinion deficient, he had an "affirmative obligation to develop the administrative record[,]" *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999), and to "inquire fully into the matters at issue[.]" 20 C.F.R. § 702.338.

The ALJ's reliance on the reports of Howard Goldberg, PhD, Edward Hurley, PhD, Kuhrt Wienerke, MD, who in reviewing the record considered Plaintiff's inability to read or write, does not render the ALJ's error harmless. None of those medical sources actually tested Plaintiff's ability to read and write or reached a conclusion on that issue. *See* 20 C.F.R. § 404.1564 (requiring consideration of educational background); *Clancy v. Astrue*, 2009 WL 1457690, at *4 (N.D.N.Y. May 22, 2009) (holding that consideration of evidence that contradicts educational level, including literacy, must be considered). Correspondingly, the ALJ did not question the VE about Plaintiff's inability to read and write and thus those limitations were not considered in the determination of what jobs Plaintiff could perform in the national economy.

Because the ALJ did not adequately consider Plaintiff's reading and writing

abilities in his Step Two determination which, in turn, resulted in no limits pertaining to Plaintiff's literacy in the RFC, the court GRANTS Plaintiff's motion to reverse and DENIES the Commissioner's motion to affirm.

## E.    Whether the ALJ Failed to Follow the Treating Physician Rule.

Plaintiff asserts that the ALJ violated the treating physician rule by applying the post-March 27, 2017 rule even though Plaintiff filed his original claim on November 26, 2012 and his second claim on January 19, 2017. He argues that an exchange between the ALJ and Dr. Kwock at the September 19, 2018 hearing demonstrates that the ALJ was applying the wrong standard. He also argues that the ALJ erred by according the most weight to consultative physician Dr. Kwock, little weight to treating physician, Dr. King, and no weight to treating physician, Dr. Shen, and chiropractor, Erin Wright, at Step Four.

The treating physician rule from pre-March 27, 2017 applies to Plaintiff's claim. *Harrison v. Comm'r of Soc. Sec.*, 2018 WL 3153399, at *3 n.4 (W.D.N.Y. June 28, 2018) ("SSR 06-03p has been rescinded by Federal Register Notice Vol. 82, No. 57, page 15263, but remains in effect for claims filed before March 27, 2017."). The ALJ thus erred when he directed both counsel and a witness to the wrong rule. *See* AR 544, 545. The pre-March 27, 2017 regulations state:

Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's medical opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the medical opinion. We will always give good reasons

in our notice of determination or decision for the weight we give your
treating source's medical opinion.

20 C.F.R. § 404.1527(c)(2).

If an ALJ decides a treating physician opinion is not entitled to controlling weight,
he or she must determine how much weight, if any, to give it using the "nonexclusive
*Burgess* factors: (1) the frequen[cy], length, nature, and extent of treatment; (2) the
amount of medical evidence supporting the opinion; (3) the consistency of the opinion
with the remaining medical evidence; and (4) whether the physician is a specialist."
*Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (internal quotation marks
omitted) (alteration in original). "[T]he ALJ must give good reasons . . . for the weight [it
gives the] treating source's [medical] opinion[,]" *id.* at 96 (internal quotation marks
omitted) (alterations in original), however, "recitation of each and every factor" is not
required so long as "the ALJ's reasoning and adherence to the regulation are clear[.]"
*Rivera v. Comm'r of Soc. Sec.*, 394 F. Supp. 3d 486, 494 (S.D.N.Y. 2019) (internal
brackets omitted) (quoting *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013)). "An
ALJ's failure to explicitly apply the *Burgess* factors when assigning weight" to a treating
physician's opinion "is a procedural error" that is harmless only if "a searching review of
the record assures [the court] that the substance of the treating physician rule was not
traversed[.]" *Estrella*, 925 F.3d at 96 (citations and internal quotation marks omitted).

The treating physician rule does not require the ALJ to defer to a treating
physician's opinion on an issue reserved for the Commissioner's judgment, "including
the ultimate finding of whether a claimant is disabled and cannot work[.]" *Snell v. Apfel*,
177 F.3d 128, 133 (2d Cir. 1999); *see* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) ("A
statement by a medical source that you are 'disabled' or 'unable to work' does not mean
that we will determine that you are disabled."). However, the Commissioner's
prerogative to determine disability "does not exempt administrative decisionmakers from
their obligation . . . to explain why a treating physician's opinions are not being credited."
*Snell*, 177 F.3d at 134 (remanding to Appeals Council "for a statement of the reasons on
the basis of which [plaintiff's treating physician's] finding of disability was rejected.").

In July 2009, Dr. King reviewed an MRI of Plaintiff's back following a work-related injury which revealed that Plaintiff's lumbar spine had stenosis and right L5 nerve root compression. Plaintiff returned to work from 2009-2010. He alleges disability starting on February 5, 2011 when he claims his 2009 work injury was exacerbated. In March 2011, Melissa Rowe, a nurse practitioner, ordered an MRI which showed extruded lumbar disc L4-L5, lumbar canal stenosis, lumbar disc degeneration, and lumbar disc disorder with myelopathy. Dr. King reviewed that MRI and noted that Plaintiff's diffuse disc bulge and hypertrophic change were slightly decreased in size compared to his previous MRI. The MRI also showed bilateral facet arthropathy with moderate right neural foraminal stenosis and moderate central stenosis but no central stenosis or neuroforaminal narrowing.

In January 2013, Dr. King examined Plaintiff after he complained of lower back pain. This was a follow-up appointment from an earlier evaluation at which Plaintiff presented with these same symptoms. During the exam, Dr. King observed that Plaintiff still could not sit due to pain, that he appeared uncomfortable, and had an antalgic gait. Dr. King did not observe a hemiparetic gait and noted that he had "normal lower extremity compartments." (AR 360.)[8] Dr. King ordered an MRI and noted that Plaintiff has a congenitally small lumbar spinal canal with superimposed multilevel stenosis, mild facet degenerative changes at L3-L4 and L4-L5, and transitional lumbar spine. With regard to the mild facet degenerative changes on L4-L5, Dr. King noted that there was mild foraminal encroachment but without nerve root impingement.

In November 2014, Dr. King recorded that Plaintiff struggles to do housework and

---

[8] Lower extremity compartment refers to "[c]ompartment syndrome[] . . . caused by increased pressure in the muscle compartments[.]" MEDICAL INFORMATION SYSTEM FOR LAWYERS, § 6:202 (J. Stanley McQuade, ed., 2020). The condition may arise from "swelling of the muscle fibers or bleeding or any other space occupying them in the compartment; and when the nerve fibers or nerve endings in the compartment are squeezed, this causes pain" and "may resolve with rest and should then be followed by strengthening exercises. In severe cases (where there is unmanageable pain or where vascular or neurological damage may produce permanent impairments) the pressure may need to be relieved by fasciotomy (incising the fascial cover)." *Id.*

can only perform light housework because tasks such as squatting are difficult. Plaintiff reported that he could leave the house to do shopping but that is the most activity he can do and that he walks to prevent himself from stiffening up. Dr. King diagnosed Plaintiff with persistent lumbar disc syndrome with left L4 and L5 radiculopathy. Plaintiff saw Dr. King in October 2016 to discuss his pain which he rated at an eight out of ten and which radiated bilaterally down his legs.

In July 2018, Dr. King submitted a medical source statement of ability to do work related activities wherein he noted Plaintiff's physical limitations, opining that Plaintiff could only lift or carry up to ten pounds up to one-third of a workday. Plaintiff could sit for eight minutes, stand for four to five minutes, and walk for three to five minutes without interruption. In total, Dr. King identified that Plaintiff could sit for thirty-five minutes, stand for twenty minutes, and walk for fifteen to twenty minutes per workday, noting that he must lie down on either side for one to one and a half hours in between each period of sitting, standing or walking. Dr. King also opined that although Plaintiff does not need a cane to ambulate, he uses furniture and fixtures for support when available and he was unable to climb stairs, ladders, and scaffolding, was unable to reach overhead, push, and pull, and could not operate foot controls.

Despite his recognition that Dr. King was Plaintiff's treating physician, the ALJ gave Dr. King's opinion little weight because he saw Plaintiff only four times during the period at issue and because there was no record that Dr. King and Plaintiff ever discussed his physical limitations.[9] He further found that Dr. King's determination that Plaintiff was unable to walk or shop contradicted Plaintiff's own statements. In recounting that Dr. King saw Plaintiff only four times during the relevant period, the ALJ ignores the full length of the treatment relationship which began in 2009 not in 2013 and which involved at least a dozen appointments with Dr. King. Additionally, by noting that there was no record that Dr. King and Plaintiff had conversations about Plaintiff's specific limitations, the ALJ assumes that all discussions between a doctor and his or her patient are recorded

---

[9] For example, the ALJ noted that Dr. King and Plaintiff never discussed Plaintiff lying down for periods of time, his ability to use his hands, or his ability to climb a ladder.

in treatment notes. Because the ALJ failed to provide "good reasons" for according Dr. King's opinions less that controlling weight, a remand is required. The ALJ made a similar error with regard to treating physician Dr. Shen.

In February 2013, Plaintiff met with Dr. Shen, a specialist, who reviewed the January 2013 MRI and noted that Plaintiff has congenitally short pedicles and progression of his lumbar spinal stenosis and the AP diameter of spinal canal at L4-L5 is only five millimeters. Based on his observations, Dr. Shen recommended a minimally invasive L2/3, L3/4, and L4/5 laminotomy/foraminotomy. Before this operation was completed in May 2013, Dr. Shen reported that Plaintiff was having the surgery because he had reported low back pain, left leg weakness, and bilateral thigh spasms over four years with no significant relief from his multiple epidural steroid injections, facet block, physical therapy, and chiropractic treatment. Dr. Shen noted that a new MRI showed multilevel lumbar spinal stenosis and opined that Plaintiff's "subjective pain rating tends to be accurate and there is no evidence of abnormal illness behavior . . . [a]s such, [Plaintiff's] objective . . . task performance should be given equal weight to his subjective reports of perceived ability." (AR 463.) In July 2014, in a functional capacity evaluation, he concluded that Plaintiff, in his current condition, met the description of Listing 1.04(A).[10]

In February 2015, Dr. Shen stated in a letter that Plaintiff had some improvement after his surgery but that his improvement had "plateaued." (AR 869.) He also noted that there was no nerve root impingement at right L4-L5 but due to his congenitally short pedicles, Plaintiff's lumbar spinal canal was narrow and there was impingement of thecal sac and lumbar nerve roots. In 2017, Dr. Shen wrote a letter in which he stated again that Plaintiff met the requirements for Listing 1.04(A) because he has congenital narrowing of

---

[10] In his report, Dr. Shen noted Plaintiff's physical limitations. With regard to lifting, he concluded that Plaintiff was limited to occasional mid lifts of fifteen pounds and occasional high lifts of five pounds, and that Plaintiff could not perform low lifts, carrying, pushing or pulling. Additionally, Dr. Shen concluded that Plaintiff could stand, walk, stoop, crouch, kneel, or crawl between 0-33% of his workday, could sit, react, or handle 34-66% of his workday, and finger for 65-100% of his workday.

his spinal column that causes nerve root compression.

The ALJ gave Dr. Shen's opinion regarding Plaintiff's satisfaction of Listing 1.04(A) requirements "no weight" (AR 513) because that issue was reserved for the Commissioner. This was in error because although the ALJ is not bound by that opinion, he must at least consider it. *See* 20 C.F.R. § 404.1527(d) (requiring the Commissioner to "consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing[.]"); *see also Krissy Mae Jean J. v. Comm'r of Soc. Sec.*, 2020 WL 3638233, at *9 (D. Vt. July 6, 2020) (granting motion to reverse decision of Commissioner where "the ALJ failed to provide good reasons for failing to accord controlling weight to [the treating physician's] opinion" and, as a result, "the treating physician rule was violated.").

In May 2018, Erin Wright, a chiropractor who had been providing chiropractic care to Plaintiff since July 20, 2016, observed that Plaintiff continued to have severe pain in his lower back, and numbness into his left leg as well as limited range of motion. Concurring with the conclusion of Dr. Shen, she stated that Plaintiff's negative straight leg raise tests does not negate nerve root compression. The ALJ afforded no weight to Ms. Wright's opinion because it concurred with Dr. Shen's opinion which he rejected and because she "never saw the [Plaintiff] during the period at issue, seeing [him] as a new patient a month after the date last insured." (AR 519.) Although Ms. Wright's opinion is not entitled to "controlling weight" because she is a chiropractor and thus not considered a medical source, *Balsamo v. Chater*, 142 F.3d 75, 80 n.1 (2d Cir. 1998) (noting that chiropractors are not treating physicians); *cf.* Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995) (holding that "a chiropractor's opinion is not a medical opinion") (emphasis omitted), her opinion was nevertheless entitled to consideration using the same factors used to evaluate the opinion of a treating source. 20 C.F.R. § 404.1527(f)(1) ("we will consider [non-medical] opinions using the same factors" as used to analyze medical opinions but "not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source or from a nonmedical source depends on the particular facts in each

18

case."). Here, the ALJ properly considered the length and nature of the treating relationship, the nature of the treatment provided, and Ms. Wright's treatment notes and area of expertise and concluded that Ms. Wright's treatment of Plaintiff did not pertain to the relevant period and was therefore of little assistance in determining Plaintiff's impairments. Against this backdrop, his decision to assign her opinion no weight was not in clear error.

After discounting the opinions of Plaintiff's treating physicians, the ALJ afforded the most weight to Dr. Kwock, a non-examining consultative physician who reviewed the record and testified at the hearing. Dr. Kwock opined that Plaintiff has mild residual degenerative disc and degenerative joint disease in the lumbar spine but that he did not meet any of the Listings. He further testified that Plaintiff could perform light work including: frequently lifting and carrying ten pounds; occasionally lifting and carrying eleven to twenty pounds; never lifting or carrying more than twenty-one pounds; sitting for six out of eight hours, standing and walking for six out of eight hours; reaching, handling, fingering, feeling, pushing and pulling continuously bilaterally; frequently using his feet for pushing, pulling, pedal, levers, etc. bilaterally; frequently climbing stairs and ramps; occasionally climbing ladders and scaffolds; frequently balancing and crouching; occasionally crawling; and frequently working in unprotected heights, exposed environments and working in proximity to heavy or moving machinery.

Dr. Kwock concluded there was little evidence of spinal canal stenosis and no evidence of nerve root involvement based on Plaintiff's normal and steady gait and because the only sensory loss was in his right thigh. In according Dr. Kwock's opinion great weight, the ALJ failed to acknowledge that it conflicted with the Remand Order and the opinions of every treating physician. *See Hidalgo v. Bowen*, 822 F.2d 294, 297 (2d Cir. 1987) ("A corollary to the treating physician rule is that the opinion of a non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis.").

In his November 24, 2014 decision, the ALJ relied on the opinions of consultative physicians Leslie Abramson, MD, and Elizabeth White, MD, and other examining

19

physicians, to conclude that Plaintiff could perform sedentary work. In his second decision, he does not explain why Plaintiff's residual functional capacity increased from sedentary to light work notwithstanding the arguable lack of improvement in his symptoms.

Because the ALJ failed to give "good reasons" for failing to accord controlling weight to Dr. Shen's and Dr. King's opinions, the court GRANTS Plaintiff's motion to reverse and DENIES the Commissioner's motion to affirm.

### F.    Whether the ALJ Misapplied the Medical Equivalence Rule.

Plaintiff asserts that the ALJ misapplied the medical equivalence rule because he should have considered Dr. Shen's conclusion that Plaintiff's "congenitally narrow spinal canal causes a condition that is more debilitating and serious than a herniated disc as demonstrated by the straight leg raise." (Doc. 9 at 15.) Plaintiff contends that this is precisely the type of evidence the ALJ should rely on in making equivalence determinations.

Under 20 C.F.R. § 404.1526, an impairment is "medically equivalent to an impairment listed in Appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment." To determine medical equivalence when the claimant has an impairment described in Appendix 1 but does not exhibit the findings specified or one or more findings is not as severe as specified, the ALJ must determine whether there are other findings that are of at least equal medical significance. 20 C.F.R. § 404.1526(b)(1). The ALJ should consider all the evidence about a claimant's impairment but not vocational factors. *See* 20 C.F.R. § 404.1526(c) (requiring the Commissioner to consider "all evidence in [a] case record about [a claimant's] impairment(s) and its effects on [a claimant] that is relevant to this finding.").

A claimant does not demonstrate medical equivalence by "showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." To qualify for benefits, a claimant must demonstrate he meets all of the specified medical criteria. *See Ottis v. Comm'r of Soc. Sec.*, 249 Fed. App'x 887, 888 (2d Cir. 2007) (citing *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)).

Plaintiff argues that the ALJ failed to consider Dr. Shen's determination of medical equivalence. The court agrees that the issue of medical equivalence was not adequately addressed in the ALJ's decision. On remand, the ALJ should make a new determination of medical equivalence in accordance with this Opinion and Order.

## G. Whether Remand for the Calculation of Benefits is Warranted.

Plaintiff seeks a remand for a calculation of benefits which is appropriate where "the records provided persuasive evidence of total disability that rendered any further proceedings pointless." *Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999). A record contains "persuasive proof" of disability when there is "no apparent basis to conclude" that additional evidence "might support the Commissioner's decision." *Rosa v. Callahan,* 168 F.3d 72, 83 (2d Cir. 1999). In deciding whether a remand is the proper remedy, the Second Circuit has "stated that where the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate." *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005).

ALJ Merrill previously concluded that Plaintiff was only able to perform work at a sedentary level. Two consulting physicians, Drs. Abramson and White, reached that same conclusion. In ALJ Merrill's second decision, he concluded that Plaintiff can perform light work with certain restrictions but provided no explanation as to why and how Plaintiff's exertional abilities had increased. The ALJ further failed to credit evidence that Plaintiff can neither read nor write and violated the treating physician rule as it pertains to Drs. King and Shen. Correction of these errors may result in a different outcome. Because the operative facts remain in flux, the court cannot remand for a calculation of benefits. *See Rosa*, 168 F.3d at 83 (holding that remand for calculation of benefits is appropriate only when there is no "basis to conclude that a more complete record might support the Commissioner's decision" that the claimant would be classified as able to work). The court therefore DENIES Plaintiff's motion for remand for a calculation of benefits.

## CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiff's motion for an order reversing the Commissioner's decision (Doc. 9) and DENIES the Commissioner's motion to affirm (Doc. 14). The court REMANDS to a new ALJ for a determination consistent with the Opinion and Order. In doing so, the court does not find that ALJ Merrill is biased, however, it finds that his failure to follow the Remand Order requires reassignment to a new ALJ so that error will not be repeated. *See Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004) (holding that remand to a new ALJ is appropriate when there is a "clear indication that the ALJ will not apply the appropriate legal standard on remand.").

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 22nd day of December, 2020.

Christina Reiss, District Judge
United States District Court

22